## **AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT APPLICATION**

I, Colin Simons, being duly sworn, depose and state as follows:

### **Affiant Background and Purpose of Application**

1.    I submit this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to search a cellular telephone further described with

particularity in Attachment A (the "DEVICE"), which is currently stored in evidence at Vermont

State Police Barracks in Derby, Vermont. Based on my training and experience, the DEVICE has

been stored in such a manner that the data it contains will remain in the same condition as when

the DEVICE was seized. The DEVICE was seized from Luke McKinnie during a vehicle search

in the District of Vermont on August 26, 2024. The warrant would authorize the extraction of

electronically stored data from the DEVICE and the seizure of the information described in

Attachment B. I submit there is probable cause to search the DEVICE for evidence relating to

violations of 21 U.S.C. §§ 841 and 846 and 18 U.S.C. § 924(c)—specifically, distribution of

controlled substances, possession with intent to distribute controlled substances, conspiracy to

commit those drug offenses, and possession of a firearm in furtherance of those offenses.

2.    I am a Special Agent with Federal Bureau of Investigation (FBI), currently assigned

to the Burlington, Vermont office, which is part of the Albany, New York Division. I have been a

Special Agent with the FBI for over 20 years. I am responsible for working cases involving a

variety of criminal violations to include drug investigations, violent crimes, and drug trafficking

organizations/gangs. I have been the affiant for numerous federal complaints and search warrants

pertaining to violent crimes and drugs. As a Special Agent, I am authorized to investigate

violations of laws of the United States and to execute warrants issues under the authority of the

United States.

1

3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses in the course of this investigation. This investigation has involved a collaboration with the Northern Vermont Drug Task Force (NVDTF), Homeland Security Investigations (HSI), the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), FBI, and the Vermont State Police (VSP), as well as other assisting state and local law enforcement organizations. I have personally participated in many aspects of this investigation, and I have reviewed information from other investigators, law enforcement reports and affidavits, and interviews with witnesses involved. When a statement of another individual is included herein, it is presented in sum and substance, unless it is shown to be quoted directly. This affidavit is intended to show that there is probable cause for the requested search warrant, so it does not set forth all of my knowledge about this matter.

### Probable Cause

4.    In July 2024, FBI, HSI, and the NVDTF started an investigation into the distribution of fentanyl and cocaine base in the Caledonia and Orleans County area of Vermont by a target known to investigators as Michael Louis. The NVDTF received information from the St. Johnsbury [Vermont] Police Department (SJPD) and the Newport [Vermont] Police Department (NPD) that a gray 2002 Ford E-350 van bearing New Hampshire registration 3865490 (hereafter referred to as the "van") had been connected to possible drug activities. New Hampshire records indicate the van is registered to David and Gloria Louis at an address in Littleton, New Hampshire.

5.    SJPD informed the NVDTF that they observed the van frequent what SJPD believed to be drug-involved premises in St. Johnsbury, Vermont. NVDTF was aware of the residences

2

SJPD identified the van as frequenting because NVDTF investigators had independently conducted surveillance activities at the same locations and saw known narcotic users and dealers visiting the residences. In the months of July and August 2024, SJPD had law enforcement interactions with the van and identified its operator as Michael Louis. Some of those interactions resulted from suspected narcotics-related incidents.

6.     Independently, NPD investigators informed NVDTF they had received information from a concerned citizen that the subject van was frequenting a camper in Newport, Vermont. According to NPD, the concerned citizen advised that every time the van stopped at the camper, a duffle bag was brought inside the camper.

7.     During this investigation, a Confidential Informant (described further below and referred to herein as CI, using "she/he" and "him/her" pronouns) began providing information to NVDTF regarding the van and its possible narcotics-related activities.[1]  Thereafter, during the month of August 2024, the NVDTF used the assistance of CI to conduct two controlled purchases of suspected narcotics at the Newport camper. The van was not present during those purchases, however.

8.     During the month of August 2024, CI informed NVDTF she/he observed the subject van arrive at a particular residence (the location of which is known to law enforcement) and witnessed its male driver, whom he knew as "Mike from New Hampshire," deliver a

---

[1] CI was assisting NVDTF for monetary compensation which was not contingent upon the identity of the target(s) of the investigation. Based on CI's statements to NVDTF, CI is a recovering cocaine base user who was sober at the time of this investigation. CI has one felony and thirteen misdemeanor convictions of which NVDTF investigators are aware. CI has provided information leading to the arrest and the prosecution of an individual in the United States District Court for the District of Vermont. The NVDTF detectives believe CI is a reliable and credible source of information based on detectives' observations during surveillance and corroborated information provided by the CI during this and other investigations.

package to a person at the residence. CI saw the contents of the package and reported to NVDTF

that, based on her/his past experience, she/he believed it to contain cocaine base and fentanyl in

bulk form. Due to this information and past law enforcement encounters, NVDTF believes the

"Mike" described by CI to be Michael Louis of Lisbon, New Hampshire.

    9.    On August 24, 2024, law enforcement surveilled the subject van as it drove south on

Interstate 91 in Massachusetts. On August 26, 2024, law enforcement then located and surveilled

the van as it drove north on I-91 in southern Vermont. While it was driving north, investigators

observed and documented numerous moving motor vehicle violations, to include exceeding the

speed limit, improper use of a turn signal, and lane violations. Vermont State Police Trooper

Mark Pohlman initiated a motor vehicle stop on I-91 north in the town of Barnet, Vermont for

those violations. NPD Officer Joshua Lillis assisted in the stop to provide backup to Trooper

Pohlman and assistance with his certified canine partner, Ozzy.[2] During the stop, Trooper

Pohlman identified the van's driver as Michael Louis via his New Hampshire driver's license.

During that interaction, Officer Lillis had his canine partner conduct a free-air sniff on the

exterior of the van. Officer Lillis informed Trooper Pohlman that the canine alerted to the

presence of the odor of narcotics emanating from the vehicle at the rear passenger-side wheel

well. When asked, Louis declined to provide consent for a search of the vehicle.

    10.    NVDTF Det. Sgt. Karl Gardner, NVDTF Det. Tpr. Steven Fauteux, and I arrived at

the traffic stop to assist, and we observed Louis standing outside of the van. An individual known

to NVDTF as Luke McKinnie was sitting on a mattress in the back area of the van, and a female

---

[2] According to an affidavit from Officer Lillis dated August 31, 2024, that I have reviewed, Ozzy
has been certified in drug detection by the Vermont Training Criminal Justice Council since
February 15, 2019. Ozzy is trained to detect the odors of cocaine, crack cocaine, ecstasy, heroin,
and methamphetamine. Ozzy was most recently recertified in drug odor detection on December
13, 2023.

4

known to NVDTF as a narcotics user from the Caledonia County, Vermont area was sitting in the front passenger seat.

11.  When Det. Sgt. Gardner approached McKinnie, McKinnie was on the phone using FaceTime to communicate with another person. Det. Sgt. Gardner observed McKinnie attempt to provide his current location to someone. Det. Sgt. Gardner asked McKinnie to exit the van, and he complied. Det. Sgt. Gardner took the phone from McKinnie (the DEVICE) and placed it where McKinnie was originally sitting. While McKinnie was being escorted to the front of a police cruiser, multiple law enforcement officers, including myself, observed what appeared to be a large sum of U.S. Currency in a pocket of McKinnie's pants. The female passenger was also removed from the van and placed in front of the cruiser.

12.  Pursuant to the canine's alert and other indicators of potential narcotics activities involving the van, law enforcement began searching the van. Det. Sgt. Gardner found a black-and-pink backpack located next to where McKinnie had been sitting. The bag was partially open, and a handgun was visible in the bag. The handgun, a Taurus G3C 9-millimeter pistol, was removed from the bag and placed on the floor of the van. It was found to have a fully loaded magazine with a round in the chamber. The backpack also contained a blue-and-white hooded sweatshirt, and investigators found a clear Ziplock bag containing three separate clear plastic bags inside the sweatshirt. One bag contained a hard white substance, another bag contained a white powdery substance, and the third contained a grayish powdery substance. Based on the detectives' training and experience, the materials appeared to be visually consistent with cocaine base (crack) and fentanyl.

13.  Investigators found a black plastic bag on the floor of the van, next to the mattress, and it contained U.S. Currency. They also found a yellow M&M's bag containing a white

5

powdery substance in the door pocket of the rear area of the van. The currency, suspected

narcotics, handgun, M&M's bag, and McKinnie's cell phone (the DEVICE) were all seized by

investigators.

14. The three occupants were detained and transported to VSP's St. Johnsbury Barracks

for further investigation. McKinnie claimed the U.S. Currency in his pocket and inside the black

plastic bag (totaling $7,000) belonged to him. Prior to being transported, McKinnie had asked for

the blue and white sweatshirt (in which the suspected narcotics were wrapped) so he could wear

it. McKinnie had initially provided a false name when asked by law enforcement to identify

himself. Once at the barracks, however, McKinnie provided his legal name to investigators.

Investigators reviewed McKinnie's criminal history and confirmed his identity with a photograph

from a prior arrest. In doing so, they learned McKinnie had an active arrest warrant in Vermont

for possession of cocaine greater than 2.5 grams. McKinnie also had an outstanding arrest

warrant (in-state only) from Massachusetts for a case involving a firearm.

15. The seized substances were later field tested by NVDTF Det. Trp. Steven Fauteux.

The hard white substance tested presumptively positive for the presence of cocaine using a

TruNarc Drug Analyzer. The suspected cocaine weighed approximately 256 grams (inclusive of

packaging). The white powdery substance and grayish powdery substance test presumptively

positive for the presence of fentanyl using a NARK II (Narcotics Analysis Reagent Kit). The

suspected fentanyl combined weight was approximately 44 grams (including of packaging).

Based on my training and experience, those quantities are consistent with distribution and not

possession for personal use. The white powdery substance inside the M&M's bag tested

presumptively for baking soda using a TruNarc Drug Analyzer. The seized U.S. currency was

6

counted by an electronic money counter in the presence of law enforcement, and it was found to total $7,000.

### Training and Experience Relevant to Drug Trafficker Cellular Phone Use

16.  In my experience investigating narcotics possession and trafficking offenses, I have found that electronic devices, such as cellular phones similar to the DEVICE, were commonly used to facilitate domestic trafficking of illicit narcotics. Traffickers often use such devices to coordinate procurement, sales, transport, and distribution of their illegal commodities, as well as the collection and distribution of proceeds related to those offenses. In my experience, traffickers often use more than one cell phone; for example, they may use one cell phone to communicate with drug customers, another cell phone to communicate with drug suppliers, and/or another cell phone for personal purposes. In my experience, traffickers often use third party applications such as WhatsApp, Facebook Messenger, Snapchat, and Telegram.  When data are acquired from recipients of the communications or from the service providers, it may be difficult to attribute those data to a particular sender. Further, such services often use levels of encryption to protect the content and context of their communication. Examination of electronic devices seized directly from the suspected trafficker or possessor of controlled substances can lead to attribution of those communications to the possessor(s) of the devices.

17.  Both distributors and users of controlled substances frequently retain contact information about, historical messages with, and other data regarding their sources and customers of controlled substances in their cellular phones. Evidence on cellular phones of controlled substance transactions often includes logs of calls, text messages (both within the phone's text messaging application and third-party applications such as WhatsApp and Facebook Messenger), contact lists, photos, and notes in various applications. The phone data frequently

7

establish details of specific drug transactions, such as the date, time, quantity, cost, and means of payment, including payments through applications using the phones such as those made through CashApp, Venmo, or cryptocurrency transactions. Communications stored or logged on the phones may also contain evidence of alleged debts owed to the sources of controlled substances.

18. In my training and experience, drug distributors also frequently photograph and send images of their products to users as a means of advertisement to their customers. They also frequently photograph and send images of the proceeds from drug sales and of firearms used to protect the drugs and proceeds. Such images may appear in messages between the distributor and users in various applications and may be stored on the DEVICE.

19. In my training and experience, drug distributors and users frequently use their smart phones to navigate, including to and from distribution locations and/or source cities, using global positioning system (GPS) access. Most current cellular phones have a mapping application that provides location information and directions for navigation, and additional navigation applications are available for download. Users frequently take screenshots of a map application to show others where they are or where to meet and send the images via a messaging application; alternatively, some mapping applications allow the user to send location data directly through a "pin drop." Evidence of drug storage or distribution locations therefore may be found in a phone's mapping applications, image database, and messaging applications.

20. Information stored in the memories of these communication devices often constitutes evidence of criminal activity. Among other things, the evidence may contain the telephone numbers assigned to the communication device, messages received by or sent from the device, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received.

21.  Based on my knowledge, training, and experience, I know that the DEVICE can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the DEVICE. This information can sometimes be recovered with forensics tools.

22.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the DEVICE because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic device were used, the purpose of its use, who used it, and when.

d.  The process of identifying the exact electronically stored data on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend

9

on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

23. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICE consistent with the methods described. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that will capture all files and databases stored on the DEVICE. These files and databases would then be parsed by a digital forensic tool so the data can be reviewed by an investigator. Although some data may contain a date and timestamp, some data may not. Thus, the entire data set must be parsed and reviewed in a digital forensic tool by the investigator to determine how the data applies to the context of the warrant. Much like the execution of a search of a physical location requires observing items to determine if they are evidence of the crimes under investigation, the review of data from the DEVICE will determine what evidence will be seized as described in Attachment B.

## Conclusion and Requests

24. I further submit there is probable cause to believe that evidence of violations of 21 U.S.C. §§ 841 and 846 and 18 U.S.C. § 924(c) are present on the DEVICE and that the DEVICE constitutes property used in committing those offenses. Accordingly, I request the Court issue a search warrant for the DEVICE described in Attachment A and the seizure from the DEVICE of items listed in Attachment B. Because this warrant seeks only permission to examine the

DEVICE, which are already in law enforcement's possession, the execution of the warrant would not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Dated at Burlington, in the District of Vermont, this 11th day of September 2024.

*Attested to by reliable electronic means.*
Colin Simons
Special Agent, FBI

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Facetime video call on this __11__ day of September 2024.

Honorable Kevin J. Doyle
United States Magistrate Judge
District of Vermont

11